UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60532-CIV-SMITH/REID

MARLANDA GRAY PITTMAN,

       Plaintiff,

v.

KILOLO KIJAKAZI[1],
Acting Commissioner of Social Security
Administration,

       Defendant.

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

      This cause is before the Court on Plaintiff Marlanda Gray Pittman's Motion for Summary Judgment [ECF No. 23], and Defendant Kilolo Kijakazi, Commissioner of Social Security's ("Commissioner" or "Defendant") Motion for Summary Judgment [ECF No. 25]. For the reasons stated below, I **RECOMMEND** Plaintiff's Motion for Summary Judgment be **DENIED**, Defendant's Motion for Summary Judgment be **GRANTED**, and the Administrative Law Judge's ("ALJ") decision be **AFFIRMED**.

**BACKGROUND**

      Plaintiff appeals the denial of her application for Supplement Security Income ("SSI"). Plaintiff protectively filed her application for SSI on July 6, 2016, alleging disability beginning on

---

[1] The original Defendant in this case, Andrew Saul, no longer holds the position of Commissioner of the Social Security Administration. Former Commissioner Saul's successor, Kilolo Kijakazi, has been automatically substituted as the Defendant. *See* Fed. R. Civ. P. 25(d) (providing "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party."). The Clerk's Office is **INSTRUCTED** to make this modification on the docket.

February 1, 2016. [ECF No. 17 at 18]. Specifically, Plaintiff alleges she suffers from degenerative disc disease of the cervical and lumbar spine, asthma, major depressive disorder, and generalized anxiety disorder. [*Id.* at 20]. Plaintiff's claim was initially denied on August 25, 2016, and upon reconsideration on April 28, 2017. [*Id.* at 18]. Plaintiff subsequently filed a written request for hearing in front of an ALJ. [*Id.*]. On September 18, 2018, an in-person hearing was held in front of ALJ Jose Perez-Gonzalez. [*Id.*]. The hearing was attended by Plaintiff, her counsel Katherine O. Pacsios-Paredes, as well as impartial medical experts Subramaniam Krishnamurthi, M.D. and Olin M. Hamrick, Ph.D. [*Id.*]. A supplemental hearing was held on December 18, 2018, which was attended by Plaintiff and impartial vocational expert Gary R. Fannin. [*Id.*].

Following the hearing, the ALJ issued a decision denying Plaintiff's claims. *See generally* [*Id.* at 15–33]. Specifically, the ALJ concluded that Plaintiff:

(1) last met insured status requirements of the Social Security Act on June 30, 2018;

(2) did not engage in substantial gainful activity during the period from alleged onset date of February 1, 2016, through her date last insured on June 30, 2018;

(3) through the date last insured, had the following severe impairments: degenerative disc disease of the cervical and lumbar spine, asthma, major depressive disorder, and generalized anxiety disorder;

(4) through the date last insured, the claimant did not have an impairment or combination of impairment that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)), 404.1525, and 404.1526;

(5) has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), albeit with certain restrictions;

(6) through the date last insured, was unable to perform any past relevant work;

(7) was defined as a younger individual (18–49) on the date last insured, but subsequently changed age category to closely approaching advanced age;

(8) has at least a high school education and is able to communicate in English (20 CFR 416.964);

(9) transferability of job skills is not material to the disability determination because using the Medical-Vocational Rules as a framework supposed a find that Plaintiff is "not disabled," whether or not she has transferable job skill;

(10) considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Plaintiff could have performed (20 CFR 416.969 and 416.969(a)); and

(11) was not under a disability, as defined in the Social Security Act, at any time from February 1, 2016, the alleged onset date, through June 30, 2018, the date last insured (20 CFR 494.1520(g)).

[*Id.*].

## RELEVANT MEDICAL EVIDENCE

### (1) William McRoberts, M.D.

Plaintiff treated with Dr. McRoberts for a little under a year, from November 2015, through July 2016. Dr. McRoberts, a pain intervention specialist, primarily treated Plaintiff for degenerative disc disease and neck pain. On Plaintiff's initial visit, Dr. McRoberts noted she has "known degenerative disc disease in her lumbar and cervical spine and has been dealing with pain off and on for years." [ECF No. 17 at 480]. Plaintiff told the doctor that her back and neck pain began in 2009, that she received an epidural in 2011 which alleviated her pain for 3–4 years, and had previously done physical therapy with little success. [*Id.*]. During this visit, Dr. McRoberts reviewed a cervical MRI that had been performed in August 2015 and observed that "while there is some cervical degenerative disc disease, it is not severe." [*Id.*]. Plaintiff, however, was noted to have mild arthritis and "moderate-to-severe facet joint hypertrophy." [*Id.*].

During this first examination, Dr. McRoberts devised a treatment plan of epidural steroid injections based upon Plaintiff's past success with epidural steroids. [*Id.* at 482]. In the event the epidural injections did not work, he determined to "try a diagnostic facet joint nerve block along the cervical spine and/or lumbar spine." [*Id.*]. In keeping with this plan, on December 2, 2015, Plaintiff received a transforaminal epidural steroid injection at the C5/6 and C6/7 levels. [*Id.* at 493–94]. Dr. McRoberts administered a second transforaminal epidural steroid injection at L4/5 on December 23, 2015. [*Id.* at 491–92].

On January 6, 2016, Plaintiff appeared for a follow-up examination following the two epidural steroid injections. [*Id.* at 479]. Plaintiff indicated that while she experienced pain relief from the cervical epidural for approximately two days, the pain resumed thereafter and that "[s]he really had a very insignificant amount of pain relief." [*Id.*]. Dr. McRoberts suspected that Plaintiff "may have more facet-mediated pain," and believed given the lack of success with the epidural "a diagnostic C4-C7 facet joint nerve block" would be a "very reasonable" course of action. [*Id.*]. Plaintiff received the facet joint nerve block the next day. [*Id.*].

Over the next three months Plaintiff received a number of repeat facet joint nerve blocks. The first was on January 21, 2016. Plaintiff indicated to Dr. McRoberts, that while she had noticed pain relief in her neck from the January 6, 2016, cervical facet joint nerve block, she was still experiencing pain in her lower back. As a result, Dr. McRoberts performed a lumbar spine facet joint nerve block that same day. On February 2, 2016, Plaintiff received a repeat facet joint nerve block on her cervical spine at the C3 through C6 levels. In March 2016, Plaintiff received two additional repeat joint facet nerve blocks. [*Id.* at 486–87].

Despite numerous facet joint nerve blocks, Plaintiff indicated she received little sustained pain relief. During a May 11, 2016, appointment, Plaintiff informed Dr. McRoberts that she was

experiencing 7–8/10 pain in her lumbar spine. Plaintiff explained that for a month after receiving the lumbar facet joint nerve blocks, she experienced 80% pain relief in her lumbar spine, but by the May 11, 2016, appointment, the pain had returned to its original severity. During this visit Plaintiff also complained of wrist pain, headaches, numbness and weakness in her left leg as well as general muscle weakness.

On June 7, 2016, Plaintiff arrived for another examination with Dr. McRoberts for a "facet joint nerve ablation on the left side from L2-L5." [*Id.* at 474]. During this visit, Plaintiff asserted she was experiencing neck pain and soreness. [*Id.*]. Dr. McRoberts noted that the plan was to give Plaintiff "a trigger point injection to go into the muscle at a later date." [*Id.*]. Plaintiff returned for another appointment with Dr. McRoberts on June 28, 2016. [*Id.* at 473]. Plaintiff informed Dr. McRoberts that she was "not getting after [the] facet joint nerve ablation and she still continues to have back pain that is worse with sitting, worse with standing, [and] relieved with lying down." [*Id.*]. Dr. McRoberts concluded that he was going to "delay the right-sided facet joint nerve ablation and re-review her lumber MRI." [*Id.*]. Further, Dr. McRoberts concluded that Plaintiff "essentially [has] L4-L5 and L4-S1 degenerative disc disease, [which is] likely the reason behind her ongoing low back pain." [*Id.*]. As such, Dr. McRoberts surmised that what he "would like to do is see if we can improve things with a left-sided L4-L5 and L5-S1 epidural … [for] both diagnostic as well as therapeutic [reasons]." [*Id.*].

Plaintiff's last recorded treatment with Dr. McRoberts was on July 7, 2016. [*Id.* at 469]. During this appointment, Plaintiff complained that she was "just not getting better" and had "worsening low back pain with radiating pain and numbness into the left leg, burning in her knees bilaterally, and burning pain in the left foot." [*Id.*]. Plaintiff inquired whether spine surgery would be a good treatment option. [*Id.*]. In concluding that it would not, Dr. McRoberts noted that he had

reviewed her lumbar and cervical MRI … [and that Plaintiff has] mild degenerative disc disease … [which] is commensurate really for someone in her mid-40s like [Plaintiff] is." [*Id.*]. Dr. McRoberts surmised that for treatment, a "left SI joint injection" and physical therapy would be helpful. [*Id.*].

### (2) Dr. Steven Vanni, D.O. (University of Miami Hospital and Clinics)

Plaintiff visited Dr. Vanni at the University of Miami Hospital and Clinics ("UHealth") on July 12, 2015, with complaints of "burning and tightness" in her shoulders and numbness on her left side. [ECF No. 17 at 378]. She reported physical pain—including "aches and stabbing" in her lower back, neck, and lumbosacral junction. [*Id.*]. Plaintiff furthermore complained of lack of sleep due to substantial and frequent headaches exacerbated by a 2008 car accident. [*Id.*]. During Plaintiff's physical examination, Dr. Vanni remarked that Plaintiff is a "very pleasant woman" who is 5'8 and 185 pounds. [*Id.*]. She was articulate, maintained a good posture, and had a normal gait. [*Id.*]. The range of motion in her lumbar was "well preserved," and her cranial nerves II through XII remained intact. [*Id.*]. However, Dr. Vanni noted that Plaintiff had some paraspinal tenderness. [*Id.*].

Dr. Vanni then reviewed Plaintiff's MRIs from 2014. [*Id.*]. While the MRI reels were not high-quality, Dr. Vanni could see a breakdown of the C5 and C6-7 disks, but the "cord is not compressed." [*Id.*]. Ultimately, Dr. Vanni recommended an updated MRI of Plaintiff's cervical and lumbar spine and a plain X-ray with flexion and extension views to see if there is any underlying instability. [*Id.*]. Plaintiff was also encouraged to have her thyroid and hemoglobin A1c checked by a specialist. [*Id.*].

### (3) Dr. Mary Lopez, Psy.D.

Dr. Lopez observed Plaintiff for a mental status evaluation ("MSE") on November 19, 2016. [*Id.* at 114]. During the session, Plaintiff's mood was "irritable, cranky, down, and depressed." [*Id.*]. Plaintiff reported her difficulties concentrating and displayed "great difficulty maintaining focus." [*Id.*]. Her short-term auditory memory appeared poor, and she was "only able to repeat up to three [stages] of numbers forward." [*Id.* at 115]. She also mentioned her depression from feeling useless, "like what am I even here for, this is not living." [*Id.* at 114]. Dr. Lopez found Plaintiff's judgment and insight as "poor." [*Id.*]. Plaintiff did, however, deny paranoid thoughts or suicidal/homicidal ideations. [*Id.* at 115]. Moreover, her speech appeared fluent and spontaneous. [*Id.* at 114]. Dr. Lopez posited that Plaintiff's did put forth a "diligent effort" during various tests. [*Id.* at 115]. She could accurately comprehend and carry out a simple three-stage command. [*Id.*].

### (4) Dominic Chiappetta, PA-C

Plaintiff first saw Physician Assistant Chiappetta on August 8, 2016, for "worsening low back pain and neck pain." [*Id.* at 505]. Plaintiff mentioned a "greater amount of burning sensation of her lower lumbar spine radiating to both of her gluteus maximus muscles, left side worse than right." [*Id.*]. While she self-rated her lumbar pain at a "9–10/10" for severity, Plaintiff stated her pain is greatest while sitting down but "temporarily lessened" while walking and standing. [*Id.*].

Plaintiff also complained of pain in her cervical spine, tingling down her left arm and reaching her wrists and both hands. [*Id.*]. Chiappetta noted Plaintiff had not had back surgery but reported numerous back injections to alleviate pain to the point that she is "tired of injections." [*Id.*]. Plaintiff told Physician Assistant Chiappetta that she had an epidural on June 28, 2017, of the left-sided L4-L5 and L5-S1—which provided no relief. [*Id.*]. She also received a "number of facet joint nerve blocks and ablations." [*Id.*].

Following her physical examination, Physician Assistant Chiappetta posited that Plaintiff's gait and coordination were normal. [*Id.* at 507]. Physician Assistant Chiappetta referred to the American Spinal Injury Association's manual muscle testing and found "5/5" strength in Plaintiff's hip flexors, knee extensors, ankle dorsiflexors, extensor hallucis longus, and ankle plantar flexors. [*Id.*]. Also of note, Physician Assistant Chiappetta wrote Plaintiff stood the entire time while providing her medical history. [*Id.* at 505].

Plaintiff had a full range of motion in her joints and normal muscle tone, while her thoracolumbar spine was "grossly normal." [*Id.*]. Ultimately, Physician Assistant Chiappetta told Plaintiff she could benefit from another injection in her left piriformis and a new lumbar spine MRI. [*Id.* at 508].

Plaintiff revisited Physician Assistant Chiappetta on November 21, 2016, who evaluated her for pain in her lower lumbar and cervical spine. [*Id.* at 501]. Plaintiff rated the pain in her lower lumbar as a "9/10," with pain at its worst when sitting and lying down. [*Id.*]. While Plaintiff was doing physical therapy for the last six months, she still reported "pins and needles" from the posterolateral aspect of her leg down to her left ankle. [*Id.*].

Regarding her cervical spine, Plaintiff told Physician Assistant Chiappetta that she feels numbness, pins, and needles radiating down her left arm to her wrist with a severity level of "8–9/10". [*Id.*]. Plaintiff also told Physician Assistant Chiappetta that driving is a painful, difficult task due to the pain in her neck. [*Id.*].

Physician Assistant Chiappetta reviewed a recent MRI of her cervical and lumbar spine from August 25, 2015, which revealed degenerative changes at the C4-C5-C6 and C6-C7 with sac compression but no cord compression. [*Id.*]. After Plaintiff's physical examination, Physician Assistant Chiappetta reported Plaintiff displayed "expected orientation to person, place, and time."

[*Id.*]. Her gait and coordination tested normal [*Id.*]. Plaintiff's strength in her bilateral biceps, lower lumbar spine, and knee extension were rated as a "4/5" for strength. [*Id.* at 503]. Plaintiff also showed no evidence to conclude she was suffering from depression, anxiety, or agitation. Physician Assistant Chiappetta strongly encouraged Plaintiff to have a new MRI for her lumbar spine "ASAP." [*Id.* at 504].

### (5) Robert Tomchik, M.D.

Plaintiff visited Dr. Tomchik on January 14, 2016, for neck and back pain. [*Id.* at 463]. Dr. Tomchik noted Plaintiff's range of motion in her C5–C6 decreased and diagnosed her with depression, anxiety, insomnia, chronic neck and back pain, and neuropathic pain syndrome. [*Id.*].

Plaintiff followed up with Dr. Robert Tomchik's physician assistant, Tara Wiggins-Jones, on January 25, 2017. There, Physician Assistant Wiggins-Jones stated Plaintiff uses a wheelchair two to three times a year when she had major back flares. [*Id.* at 528].

She made another appointment with Dr. Tomchik on July 7, 2017, for a physical examination of her neck and back. [*Id.* at 608]. Dr. Tomchik wrote Plaintiff was "disabled secondary to depression and chronic neck and back pain." [*Id.*]; [ECF No. 23 at 14]. Plaintiff saw Dr. Tomchik once more on February 1, 2018, to request switching her Clonazepam to Xanax. [*Id.* at 609]. Her brother had passed away shortly before this appointment, which Plaintiff stated contributed to her anxiety and depression. [*Id.*]

### (6) Jennifer Carrasquillo, M.D.

Dr. McRoberts referred Plaintiff to Dr. Carrasquillo, a neurologist at the Holy Cross Medical Group, on February 26, 2016. [*Id.* at 455]. Plaintiff told Dr. Carrasquillo that her grandfather beat her into a coma when she was a child and has since suffered from chronic fatigue and hypersomnia sleepiness. [*Id.*]. She developed physical pain in 2008 with tingling and

numbness in her shoulder down to her left side. [*Id.*]. Additionally, she has chronic migraines but feels better since she started seeing Dr. McRoberts, with her migraines now down to three a week. [*Id.*]. Following her neurological examination, Dr. Carrasquillo reported Plaintiff was "awake, alert, [and] attentive." [*Id.* at 457]. Her muscle bulk and tone appeared normal, demonstrating normal strength in her extremities. [*Id.* at 457]. Dr. Carrasquillo diagnosed Plaintiff with unexplained paresthesia and recommended Plaintiff get an MRI of her brain for demyelinating disease. [*Id.*].

**(7) Marie F. Adam, M.D., University Medical**

Plaintiff visited Marie F. Adam at University Medical on January 9, 2017, for a physical and mental examination. [*Id.* at 115]. Concerning the physical portion of her examination, University Medical noted a "5/5" grip strength with her right hand and a "4/5" for her left. [*Id.*]. She had normal leg strength on both legs, but the left side appeared to be the weaker of the two. [*Id.*] Plaintiff suffered from mobility issues and used a wheelchair, "which is medically necessary to ambulate." [*Id.*]. University Medical also reported a "slight deficit of gross motor function" on Plaintiff's left side. [*Id.*].

Regarding her mental examination, University Medical noted that Plaintiff appeared clean and cooperative. [*Id.* at 115]**.** Her speech was normal, and she demonstrated fair judgment. [*Id.*]. Nonetheless, Plaintiff appeared to show "anxiety and sadness," and her affect was "inappropriate, incongruent, flat, and even constricted." [*Id.*]. Plaintiff told University Medical doctors that she dislikes being around people and cannot trust others. [*Id.*]. Getting out of bed is difficult and she "cries for no reason, and feels worthlessness." [*Id.*]. Furthermore, Plaintiff told University Medical that she suffers from visual and auditory hallucinations due to her insomnia. [*Id.*].

**(8) Martin Hale, M.D.**

On April 5, 2017, Plaintiff visited Dr. Hale for an examination of her neck and back. [*Id.*]. Plaintiff told Dr. Hale that she had neck and back pain began in 2009 and has had a series of X-rays, MRIs, and CT scans to identify the underlying causes. [*Id.*]. Dr. Hale reported that Plaintiff's cervical spine was non-tender midline with mild paraspinal spasms. [*Id.*]. She had full range of motion in her shoulders, elbows, and wrists with full sensation in her shoulders, humerus, elbows, forearms, and hands. [*Id.*]. She demonstrated "good motor tone and strength throughout the upper extremities, including grip strength." [*Id.*].

Dr. Hale did not recognize any trochanteric tenderness or abnormal masses. [*Id.*]. Plaintiff's lumbar spine was also non-tender midline. [*Id.*]. Dr. Hale noted Plaintiff had full range of motion in her hips, thighs, knees, calves, and feet while her lower extremities had "normal pulses" [*Id.*].   X-rays taken that day revealed a loss of lordotic curve in Plaintiff's cervical region with decreased interspace at C5-6 and C6-7 and evident anterior osteophytes. [*Id.*]. X-ray images also showed that Plaintiff's lumbar was within normal limits. [*Id.*].

Plaintiff returned to Dr. Hale on May 4, 2017, for her continued neck and back pain. [*Id.* at 593]. She complained of pain radiating in both shoulders with numbness in the left arm and lumbar pain that radiated down both of her legs. [*Id.*]. Plaintiff told Dr. Hale she had chronic headaches, but no longer felt nauseous or dizzy. [*Id.*]. Overall, Plaintiff felt she had made progress. [*Id.*]. Plaintiff had started therapy which was helping. [*Id.*]. During her physical, Dr. Hale concluded that her cervical spine was non-tender midline. [*Id.*]. She had a moderate superior trapezius spasm and range of motion with moderate restriction. [*Id.*]. Plaintiff had tender bilateral sacroiliac ("SI") joints while her *extensor hallucis longus* ("EHL") was intact and her straight leg raise ("SLR") was negative. [*Id.*]. Dr. Hale recorded Plaintiff's reflexes as symmetrical with full

11

sensation in her upper extremities. [*Id.*]. She exhibited symmetrical reflexes with good grip strength and intact neurovascularly. [*Id.*]. Dr. Hale set a follow-up in four weeks. [*Id.* at 594.].

At the follow-up appointment on June 1, 2017, Plaintiff informed Dr. Hale that her condition was largely the same as the April appointment. [*Id.* at 587]. The only differences were that Dr. Hale swapped her Movantik to ease her constipation for Relistor, and he remarked that Plaintiff's blood pressure was still high and she should follow up with her primary physician. [*Id.* at 588]. Dr. Hale prescribed Plaintiff her usual medication and requested a follow-up in four weeks. [*Id.*].

Plaintiff visited Dr. Hale again on August 23, 2017, this time for significant migraine headaches. [*Id.* at 584]. Plaintiff believed the buprenorphine patch she used was exacerbating her migraines. [*Id*]. While Dr. Hale could not identify any new trauma, Plaintiff had significant pain and felt "confused" and "unsteady." [*Id.*]. Dr. Hale continued to recommend therapy and wrote that he "will start a diagnostic workup to see if we can find an explanation for her current complaints." [*Id.* at 585]. He told Plaintiff to follow up in four weeks.

Dr. Hale saw Plaintiff again on September 20, 2017, for persistent migraines. The only deviation in this appointment from the August 23, 2017, appointment was that Plaintiff restarted her buprenorphine prescription, believing now that the patches were helping her migraines. Dr. Hale set a follow-up for four weeks.

On October 18, 2017, Plaintiff revisited Dr. Hale for the same ailments. [*Id.* at 578]. Dr. Hale continued to encourage treatment and set a follow-up for four weeks. [*Id.*]. Plaintiff saw Dr. Hale in November. [*Id.* at 575]. Dr. Hale again continued the same treatment plan to "maintain function and diminish pain." [*Id.*]. On December 13, 2017, Plaintiff followed up with Dr. Hale and demonstrated the same ailments and complaints as she had previously. [*Id.* at 571]. Dr. Hale wrote

that her Butrans patches worked better than in past uses. [*Id.*]. Dr. Hale encouraged therapy and mentioned an additional diagnostic workup to the Plaintiff. [*Id.*]. However, she was hesitant to start the diagnostic workup as she wanted to wait to become stable with her medication. [*Id.* at 572]. Dr. Hale requested a follow-up in four weeks. [*Id.*]

Plaintiff did not revisit Dr. Hale until June 8, 2018, due to insurance issues. [*Id.* at 565]. The insurance problems prevented Plaintiff from receiving her usual medication proscribed by Dr. Hale, and her pain was soon "unbearable." [*Id.*]. Dr. Hale restarted her regular prescriptions, including Mobic, Zanaflex, Percoset, and Butrans patches. [*Id.* at 566]. He again encouraged therapy and set a follow-up in four weeks. [*Id.*].

Plaintiff returned on July 10, 2018. She complained of "burning pain in the soles of her feet" and was now taking Neurontin 300mg. [*Id.* at 559]. Meanwhile, her confusion and unsteady feelings had improved—even though Dr. Hale could not find an underlying cause. [*Id.*]. Dr. Hale noted Plaintiff had made progress with therapy, but the positive effects were not long-lasting. [*Id.*]. Dr. Hale then asked Plaintiff to return in four weeks. [*Id.* at 560.].

One month later, Plaintiff returned with the same complaints and received the same treatments and notes from Dr. Hale. [*Id.* at 553]. That same day, Dr. Hale wrote a Medical Assessment of Ability To Do Work-Related Activities. [*Id.* at 670]. Dr. Hale found Plaintiff could frequently lift 10 pounds, occasionally lift and carry between 11 to 20 pounds, and could never lift anything between 21 to 100 pounds. [*Id.*]. She could sit for up to three hours and could not stand or walk longer than an hour. [*Id.* at 611]. Plaintiff's use of her hands was "continuous," but she could only use her feet operationally "occasionally" with light resistance. [*Id.*]. Lastly, Plaintiff could frequently balance, occasionally stoop and kneel, but never climb, crouch, or crawl. [*Id.*].

Plaintiff returned on August 30, 2018, with the usual complaints. [*Id.* at 653]. Likewise, Dr. Hale recommended the same treatment and set a follow-up in five weeks. [*Id.* at 654]. Plaintiff returned once more on October 26, 2018. [*Id.* at 644]. She told Dr. Hale of her usual complaints, and Dr. Hale recommended the same treatment and prescribed the same medication and requested a follow-up for four weeks. [*Id.*].

**(9) B. Lee Hudson, Ph.D.**

Plaintiff had a mental status evaluation with Dr. Hudson on January 19, 2017, claiming difficulties with depression and anxiety. [*Id.* at 116]. Dr. Hudson wrote Plaintiff was 46 years old with a high school education. [*Id.* at 117]. Dr. Hudson referenced prior medical evidence that showed Plaintiff received treatment by an unidentified psychiatrist in 2010 to treat major depressive disorder. [*Id.*]. Dr. Hudson also reported "no new/worsening of mental symptoms." [*Id.*]. Plaintiff told Dr. Hudson that she had not been hospitalized for depression nor sought formal psychiatric treatment. [*Id.*]. However, Plaintiff was seen in February 2016 for a traumatic brain injury "secondary to childhood abuse." [*Id.*].

Dr. Hudson observed Plaintiff suffers from symptoms of depression and anxiety "that appear secondary to physical symptoms and numerous physical complaints." [*Id.*]. Even so, her mental status examination was within normal limits. [*Id.* at 116–17]. For example, Plaintiff could comprehend and conduct a simple three-stage command. [*Id.*]. Therefore, Dr. Hudson reported that Plaintiff's Activities of Daily Living ("ADL"), Social and CPP functioning are "no more than moderately limited by mental symptoms." [*Id.* at 117].

**(10)   State Consultative Examiner – Thomas Renny, D.O.  (Medical)**

State consultative examiner Thomas Renny, D.O. found that Plaintiff can perform light exertional work, except Plaintiff can frequently climb ramps and stairs, occasionally climb ladders,

ropes, and scaffolds. [ECF No. 17 at 119–20]. Renny further found Plaintiff could balance, crouch, and kneel frequently, and stoop and crawl occasionally. [*Id.*]. Additionally, she could lift or carry 20 pounds occasionally, lift or carry 10 pounds frequently, stand or walk for about six hours in an 8-hour workday, and could sit for the same amount. [*Id.* at 119]. Renny also found Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, humidity, vibrations, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. [*Id.* at 120].

## **HEARING TESTIMONY**

Plaintiff attended an in-person hearing before ALJ Jose Perez-Gonzales on September 18, 2018. [ECF No. 17-1]. She complained of the following conditions: asthma/chronic bronchitis, neurological dysfunction, pain all over body, difficulty breathing, chronic neck and back pain, sleep apnea, nerve blocks in her lumbar and cervical spine, ablations, depression, and anxiety. [*Id.* at 6-7]. Plaintiff's attorney argued that the opinion of Dr. Hale, who had treated Plaintiff for several years, should be afforded great weight. [*Id.* at 13].

She testified that she was 50 years old, 5' 8", weighed 190 pounds, had a high school education and had attended vocational school for business/clerical. [*Id*. at 25-26]. She stated she had stopped working in 2015 because of "chronic pain" and had last worked at a clerical job for an insurance company. [*Id*. at 26-27]. The ALJ reviewed her employment history confirming her previous employment as a bus driver and in clerical work. [*Id*. at 27-33]. She described her "main problems" as cervical and lower back pain, pain radiating on her left side. She stated her husband did "all the chores" and would "pick [her] up out of bed" because she had constant burning and aching pains in her shoulders and neck. She stated she was sometimes too weak to lift a glass and had memory loss and depression. [*Id*. at 33-36]. She testified she had been told she had degenerative disc disease and arthritis. She stated she used increasing amounts of pain medication

15

with only temporary relief. [*Id.*]. At the ALJ's request, she listed the medications she took as gabapentin, Mobic, Zanaflex, Percocet, and a Butrans narcotic patch. [*Id*. at 36].

Plaintiff attended another in-person hearing before ALJ Jose Perez-Gonzalez on December 18, 2018. [ECF No. 17 at 59]. At the hearing, Vocational Expert Gary Fannin testified and classified Plaintiff's past work by physical demand. [*Id.* at 60]. Mr. Fannin first stated that Plaintiff's work as an insurance sales agent required only "light work." [*Id.* at 62]. Regarding her prior work as a bus driver, Mr. Fannin testified that bus drivers require a medium level of work. [*Id.*]. Lastly, Mr. Fannin classified Plaintiff's job as a sales records clerk as "basically sedentary, although she might have performed partial light work…." [*Id.*].

The ALJ then posited to Mr. Fannin a hypothetical of a woman who could lift and/or carry twenty pounds occasionally, ten pounds frequently, sit and stand for six hours a day and occasionally climb stairs and ramps, occasionally balance, stoop, kneel, crouch, or crawl. [*Id.*]. The ALJ added to the hypothetical by requiring that person not be exposed to airborne particulates like dust, odors, fumes, pulmonary irritants, or work in environments with poor ventilation. [*Id.* at 63]. Lastly, the hypothetical woman could not be exposed to unprotected heights. [*Id.*].

Mr. Fannin found that this person could not perform Plaintiff's past work. [*Id.*]. However, Mr. Fannin relied on the *Dictionary of Occupational Titles* and other sources to conclude that the person could perform jobs that existed in the regional or national economy. [*Id.* at 63–64]. Mr. Fannin first testified that Plaintiff could work as a housekeeping cleaner, which is an unskilled job that requires light work. [*Id.* at 64]. Furthermore, jobs like a marker or ticketer could also fit the hypothetical person's limitations as both are unskilled jobs that require only light work. [*Id.* at 64–65].

Plaintiff's counsel then cross-examined Mr. Fannin. [*Id.* at 64]. There, counsel modified the ALJ's hypothetical to include a person who "could only occasionally adapt to routine changes in the work setting [—] meaning only a third of the day would they be able to adapt to changes in the routine work setting." [*Id.*]. Mr. Fannin responded that there may be "occasional changes" but nothing drastic enough to disqualify the three potential jobs. [*Id.* at 66].

Counsel then modified the hypothetical person to be restricted to lifting and carrying a maximum of ten pounds. [*Id.* at 66]. There, Mr. Fannin responded that a limitation of that kind would "absolutely" limit the jobs listed because "[those] jobs are light and they would require up to twenty pounds. So she wouldn't be able to [do] any of those jobs." [*Id.*]. Counsel altered the hypothetical once more to include a person limited to less than six hours of standing and walking. [*Id.*]. Mr. Fannin found this limitation would also greatly restrict potential employment as a housekeeping cleaning, marker, and ticketer because those jobs require a person to "basically [] be on their feet for most of the day…." [*Id.*].

## **RELEVANT LAW**

Standard of Review

Federal courts reviewing a social security appeal are to employ "a deferential reconsideration of the findings of fact and [an] exacting examination of the conclusions of law." *Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011). This inquiry is governed by the "substantial evidence" standard which provides the

> Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the review finds that the evidence preponderates against the Commissioner's decision.

*Kieser v. Barnhart*, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted). The Supreme Court of the United States has explained that "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Importantly, the reviewing court is prohibited from reweighing evidence already considered by the ALJ. *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014). Despite this deferential standard, the Commissioner's conclusions of law, done through the ALJ, are not afforded the same presumption of validity. *Williams*, 416 F. App'x at 862. Rather, the Commissioner's legal conclusions are reviewed *de novo*. *See Hargress v. Comm'r of Soc. Sec.*, 883 F.3d 1302, 1305 n.2 (11th Cir. 2018).

Regulatory Framework

The Social Security Regulations provide a five-step "sequential" evaluation process to be used by an ALJ to determine whether a claimant has established they are disabled. If at any step of the sequential evaluation the ALJ determines a claimant is or is not disabled, the ALJ concludes the inquiry and does not evaluate the next step. 20 C.F.R. § 416.920(a)(4).

The first step requires the ALJ to determine whether the claimant is engaged in "substantial gainful activity" ("SGA"). If the claimant is engaged in SGA then he or she is not deemed disabled and the ALJ's inquiry ends. *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004). Step two requires the ALJ to evaluate whether a claimant's alleged impairments are "medically severe." If the claimant's impairments are found to be medically severe the ALJ is to proceed to step three. *Id.* at 1237. In the third step, the ALJ must decide if any of the claimant's proffered impairments, individually or in combination, "meet or equal" any of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. *Id.* at 1238. If so, the ALJ proceeds to the fourth step.

Step four requires the ALJ to undertake a two-part analysis. First, the ALJ must assess what the claimant's "residual functional capacity" ("RFC") is. Second, based on claimant's RFC, the ALJ must determine whether claimant can return to any "past relevant work." Lastly, the fifth step, in which the claimant no longer bears the burden, requires the ALJ to determine whether, given a claimant's age, education, work experience, and RFC, the claimant can perform any work. Essentially, during this step the

> ALJ must determine if there is other work available in significant numbers in the national economy that the claimant has the ability to perform. If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled. If the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant is disabled.

*Philips*, 357 F.3d at 1239.

## DISCUSSION

First, Plaintiff questions whether VE Fannin's testimony constituted substantial evidence on which the ALJ could rely. [ECF No. 23 at 25]. Within this singular issue, there are three overarching concerns that Plaintiff raises in her motion. Each concern will be addressed in turn.

### I.  Vocational Expert Fannin's Testimony Constituted Substantial Evidence on Which the ALJ Could Rely

At the fifth step of the sequential evaluation process, an ALJ must evaluate whether there are jobs in the national economy, other than a plaintiff's past relevant work that they can perform given their impairments. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018); 20 C.F.R. §§ 404.1520(a), 416.920(a). In making this determination the ALJ "does not tally the number of job openings at a given time, but rather approximates the number of positions that exist, whether vacant or filled, and without regard to the location of the work and a claimant's likelihood of being hired." *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020).

The ALJ relies on different government publications, such as the *Dictionary of Occupational Titles* ("*DOT*"), which is published by the Department of Labor. *Id.* at 1280–81; 20 C.F.R. §§ 404.1566, 416.966. Additionally, an ALJ may rely on the expertise of vocational experts and their interpretation of publications such as the *DOT* in making step-five determinations. *See id.*; 20 C.F.R. § 416.966(e). *See also Washington,* 906 F.3d at 1360 (explaining that "the critical inquiry at step five is whether jobs exist in the national economy in significant numbers that the claimant could perform in spite of his impairments, and the ALJ can consider both jobs data drawn from the DOT as well as from the testimony of the [vocational expert] in making this determination").

The first sub-issue Plaintiff raises is the methodology VE Fannin used in calculating the total number of proposed jobs in the national economy. Defendant never directly addresses these arguments. Here, the VE employed the "equal distribution method" to calculate the number of jobs. Under this method the VE "assumes that the total number of jobs that exist for a given SOC group are distributed equally among the number of DOT occupations within that SOC group." *Goode*, 966 F.3d at 1284. Plaintiff argues that this methodology is inherently flawed and that "when employing [this method] … the results based on the federal government's own data remain wildly disparate when compared to the VE's estimate." [ECF No. 23 at 29]. In support of her attack on the equal distribution method, Plaintiff cites to a Seventh Circuit opinion which characterized the method as "illogical" because it relies on "an assumption about the relative distribution of jobs within a broader grouping that lacks any empirical footing." *Chavez v. Berryhill*, 895 F.3d 962, 969–70 (7th Cir. 2018).

The Eleventh Circuit, however, has never explicitly rejected the equal distribution method. Instead, "the Eleventh Circuit in *Goode* did not 'express [any] view on the merits of [that]

particular approach,'" rather, it "set that method forth 'so that [it would] be on the table when the matter returns to the ALJ [on remand]." *Bowles v. Kijakazi*, No. 1:20-CV-24942-PCH, 2022 WL 3133982, at *9 (S.D. Fla. Aug. 5, 2022). "Accordingly, the Eleventh Circuit's decision in *Goode*, at the very least, demonstrates that the equal distribution method is a method available to be used in conjunction with a VE's knowledge and expertise." *Id.* As such, Plaintiff's argument for a categorical rejection of the equal distribution method does not pass muster.

## II.    Subjective Complaints

### A) Vocational Expert Gary Fannin's Testimony Constituted Substantial Evidence

#### (I)    *The DOT is not outdated*

Plaintiff contends that the *Dictionary of Occupational Titles* ("*DOT*"), a manual published by the Department of Labor, while one of a "VE's primary tools," is an outdated manual that the Department of Labor has not updated since 1991. [ECF No. 23 at 27–28]. Moreover, Plaintiff claims that the *DOT* fails to provide statistical information concerning the number of jobs in the national economy. [*Id.* at 28]. Plaintiff asks this Court to ease its reliance on the manual and encourage VEs to opt for other manuals like the *Occupational Employment Quartey*, which, as Plaintiff claims, offers more accurate numbers. [*Id.*]; *see also Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014); *Brault v. Soc. Sec. Adm.*, 683 F.3d 443, 336 (2d Cir. 2012). Indeed, even the United States Supreme Court, according to Plaintiff, has offered guidance on how a VE should pivot towards a "case-by-case" approach. [*Id.* at 29]. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019). However, while Plaintiff's concerns regarding the *DOT* are noted, the Court notes the Eleventh Circuit has yet to embrace these concerns.

In support of her argument, Plaintiff relies on *Goode*, 966 F.3d 1277. There, the court "recognized that a vocational expert, after figuring out the total number of jobs in an SOC group,

needs to take an additional step to approximate how many of those are the specific job or jobs that the claimant could perform." *Id.* at 1283. The court went as far to say that "when an ALJ at step five relies on the testimony of the vocational expert for the number of jobs in the national and regional economies that a claimant could perform that testimony cannot be both internally inconsistent and incomplete" *Id.* at 1284. Plaintiff's reading of *Goode*, however, is misplaced. Nowhere in the opinion does the court call for an express prohibition against the *DOT*, and, therefore, does not alter this Court's application, nor deter a VE from using it in their testimony. As a result, the *DOT* is still a bonafide source for a VE to use in gathering their data and testifying before an ALJ.

### (II)   VE Fannin did not miscalculate job listings

Next, Plaintiff contends that there is a discrepancy between the testimony of Mr. Fannin and the software that reports job listings. [ECF No. 23 at 27]. Plaintiff believes there are "concerns about the methodology the VE employed in providing jobs." [*Id.*]. This concern stems from a hypothetical the ALJ proposed to VE Fannin:

> "[A]ssume that because of a medically determinable impairment, or a combination of impairments, such an individual has defined capabilities. [...] This person can lift and/or carry 20 pounds occasionally, 10 pounds frequently. This person can sit for six hours per an eight-hour work day, stand and walk six hours per an eight hour work day. This person can occasionally climb stairs and ramps; should never climb ladders, ropes, and scaffolds. This person can occasionally balance, stoop, kneel, crouch, or crawl. This person should avoid all exposure to dust, odors, fumes, poor ventilation, and pulmonary irritants. This person should avoid all exposure to unprotected heights. Regarding all functions of the – either to the left or right hand or arms, all functions are frequent. Using feet to operate foot controls, she can operate foot controls with either foot frequently. [...] The claimant can perform simple, routine, competitive, low stress, repetitive tasks on a sustained basis over a normal eight hour work day in a stable work environment with no more than simple decision making required; occasional interaction with the public; but it unable to perform complex and detailed tasks, or to meet fast pace high productions demands."

*See* [ECF No. 17 at 62–63]; [ECF No. 23 at 25].

From there, VE Fannin told the ALJ that this hypothetical person could be a housekeeping cleaner, marker, or ticketer. [*Id.* at 63–64]. Of those three jobs, a housekeeping cleaner estimated 100,000 jobs in the national economy. [*Id.*]. A marker had an estimated 49,000 jobs in the national economy, and a ticketer estimated around 40,000 jobs in the national economy. [*Id.*].

According to Plaintiff, VE Fannin's "statistical numbers come from the Department of Labor and the Occupational Employment Statistics, last updated at the time in May 2017." [ECF 23 at 26]. VE Fannin then divided the number of jobs in the national economy for each of the three occupations by the number of jobs per the Standard Occupational Classification ("SOC") code, "to get the pro rata share of jobs for each of the named occupations. [*Id.*].

The crux of this issue is that Plaintiff claims the "job incidence data provided by the VE for the job of ticketer is substantially overstated." [*Id.*]. While VE Fannin testified that there are roughly 40,000 ticketer jobs in the national economy, Plaintiff believes this number is closer to 770 full-time positions with just 15 jobs between Miami, Fort Lauderdale, and West Palm Beach. [*Id.* at 27]. Plaintiff discovered this stark contrast by using the software program Job Browser Pro from SkillTRAN, "which is frequently relied upon by VEs as a source of estimate jobs incidence for specific *DOT* occupations…." [*Id.*] (citing *Goode*, 966 F.3d at 1284).

From there, Plaintiff argues that when a VE uses the pro rata method, "the results based on the federal government's own data remain wildly disparate when compared to the VE's estimate." [*Id.* at 29]. So, Plaintiff reasons that by using a pro rata sum of "38 *DOT* occupations falling within the same SOC group as ticketer, the sum is 53,843," differs from the VE's amount of 40,000 ticketer jobs in the national economy. [*Id.* at 30]. Therefore, as Plaintiff claims, VE Fannin failed to provide substantial evidence to satisfy step five. [*Id.* at 29]. *See also* U.S.C. § 423(d)(2)(A) ("An individual shall be determined to be under a disability only if his … impairments are of such

23

severity that he…cannot engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives").

Defendant believes the combined total number of the jobs in the national economy for housekeeping cleaners, markers, and ticketers is 189,000, which constitutes substantial evidence needed in step five. [ECF No. 25 at 6] (citing *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (upholding ALJ's finding that jobs existed in significant numbers where totaled jobs were 174 locally, 1,600 in the state and 80,000 nationally); *Atha v. Comm'r of Soc. Sec.*, 616 F. App'x 931, 934-35 (11th Cir. 2015) (same); *Brooks v. Barnhart*, 133 F. App'x 669, 671 (11th Cir. 2005) (same). Defendant also claims that the housekeeping cleaner job, which totals 100,000 jobs in the national economy, provides substantial evidence, even if the marker and ticketer jobs are understated. [*Id.* at 7].

I find Defendant argument the more persuasive of the two. First, Plaintiff, while making valid points to the exact number of total jobs for a marker, did not point to a lack of jobs for a housekeeping cleaner. Plaintiff did not state whether the 100,000 available jobs in the national economy was at all inconsistent using Job Browser Pro. Moreover, Defendant cited to binding case law within the Eleventh Circuit stating that jobs in far fewer available positions than a housekeeping cleaner to be sufficient. [ECF No. 25 at 7]. *See also Allen*, 816 F.2d at 602; *Atha*, 616 F. App'x 934–35; *Brooks*, 133 F. App'x at 671. Because there is a substantial number of jobs in the national economy calculated by VE Fannin, the Court does not need to dive into the number of job listings for a marker and ticketer.

### (III)    VE Fannin properly characterized strength

The final sub issue related to Plaintiff's claim that there was not substantial evidence present is that her level of strength has been misconstrued in two ways. First, the ticketer job requires "constant" reaching, handling, and fingering per the SCO while the ALJ's RFC analysis states Plaintiff as one who "can *frequently* perform all functions with the left or right hands or arms. [ECF No. 23 at 31] (emphasis in original). Plaintiff went on to distinguish "constant," as "activity or condition exist[ing for] 2/3 or most of the time" per the *DOT*. [*Id.*]. Likewise, "frequent" is defined as "activity or condition exist[ing for] 1/3 to 2/3 of the time. [*Id.*]. Therefore, Plaintiff posits there is a material difference that warrants reversal. By her reasoning, the ticketer job surpasses her performance to work the job, and, therefore, "should be disregarded...and afforded no weight at all." [ECF No. 23 at 31]. Similarly, Plaintiff claims that while the ALJ's RFC finding mentions her capacity to perform simple, routine, repetitive tasks, the ALJ failed to mention Plaintiff's ability to understand, remember, or carry out simple instructions. [*Id.* at 31–32] (emphasis in original).

Second, Plaintiff adds that had the ALJ included Plaintiff's ability to follow instructions, it created an "apparent conflict" between the testimony of the VE and the findings referenced in the *DOT*. [*Id.* at 32]. Specifically, that a ticketer and marker are "Reasoning Level 2 and above jobs … inconsistent with the definition of 'simple *instructions*." [*Id.*] (citing *Albra v. Acting Comm'r of Soc. Sec.*, 825 F. App'x 704 (11th Cir. 2020) (noting that because three of the four jobs listed by the VE required a GED reasoning level of one that exceeded the plaintiff's RFC, the court held "there existed an apparent conflict between the VE's testimony about the jobs [plaintiff] could perform and the DOT's apparent conflict between the VE's testimony about the jobs [plaintiff] could perform and the DOT's descriptions of those jobs").

Plaintiff claims that the ticketer and marker jobs have "[r]easoning [l]evels that also exceed the capacity of an individual who is limited to 'simple, routine, competitive, low stress, repetitive *tasks*,' a limitation the ALJ did actually include in his RFC finding." [ECF No. 23 at 33] (emphasis in original). Plaintiff then points to *Nadile v. Saul*, in which the court stated, "[f]rom the [*DOT*'s] description, it is not clear that a person with the [p]laintiff's mental limitation of simple, routine, repetitive job tasks would be able to successfully carry out the duties of a small parts assembler, office helper, or copy machine operator." [*Id.*] (quoting No. 8:19-cv-9-T-CPT, 2020 WL 1430701, at *4 (M.D. Fla. Mar. 24, 2020). Therefore, the court held that the ALJ committed reversible legal error by not taking notice or resolving the "apparent inconsistence at the administrative hearing or anytime thereafter." [*Id.* at 33–34] (citing *Washington*, 906 F.3d 1359).

Coinciding with this argument, Plaintiff believes there is a "direct and obvious conflict" between the VE's testimony and the *DOT* "given the ALJ's RFC finding states [Plaintiff] can perform at most 'low stress' tasks and is entirely unable 'to meet fast-paced, high production demand.'" [*Id.* at 37] (citing *Id.* at 18]. Plaintiff also points to the *DOT's* "companion publication," the SCO, which lists all three jobs named by the VE to require "frequent" or "constant" reaching and handling. [*Id.*] With this, Plaintiff states that these unskilled jobs, offer little to no opportunity to deviate from "maintaining the steady flow of work," due to their inherent hands-on requirements. [*Id.* at 37].

Defendant counters by stating there is no "apparent conflict between a limitation to simple, routine, repetitive tasks and reasoning level 2 of the marker job as described in the DOT." [ECF No. 25 at 11]. Defendant points to *Valdez v. Comm'r of Soc Sec*, in which the Eleventh Circuit held that there is no inconsistency between a reasoning level 2 job and a limitation to simple,

routine, and repetitive tasks. 808 F. App'x 1005, 1010 (11th Cir. 2020). The *Valdez* court noted that:

> We haven't decided the issue Valdez raises here—whether a limitation to simple, routine, and repetitive work is inconsistent with a job that requires a reasoning level of three. But it is unnecessary to decide it because, even if Valdez was able to work as an order clerk, the ALJ still concluded that he could perform two other jobs: lens inserter, which has a reasoning level of one, *see* DOT, 713.687-026, and lens-block gauger, which has a reasoning level of two, *see id.* 716.687-030. Valdez has not argued that these jobs are inconsistent with his residual functional capacity, and they are not.

*Id.* at 1009.

Moreover, Defendant contends the term "simple tasks" does not conflict with the reasoning level 2 requirement of "few concrete variables." [*Id.* at 12]. "Simple" means "easily understood or done," and the term is "[u]sed to emphasize the fundamental and straightforward nature of something." It also means, among other things, "having or made of only one or a few parts." All of this fits neatly with the concept of tasks with "few . . . variables," as described in the definition of reasoning level 2. A limitation to "routine tasks" by comparison is described by the *DOT*'s reasoning level 2 to mean a variation "from standardized situations." "Routine" means "of a commonplace or repetitious character," or "relating to, or being in accordance with established procedure." The limitation to routine tasks is precisely what is conveyed by the notion of few variations "from standardized situations." [*Id.* at 13–14].

Furthermore, "[a] limitation to 'repetitive tasks' aligns with the *DOT*'s text because it specifically involves repetitive or short-cycle work. *See* DOT § 323.687-014, 1991 WL 672783 at *3 (Housekeeping Cleaner); *id*. § 209.587-034, 1991 WL 671802 at *2 (Marker). "Simple tasks" is a feature of the Commissioner's regulatory definition of "unskilled work," exactly, as the Defendant claims, "the type of work encompassed by the jobs identified by the VE." [." [ECF No. 25 at 13] (citing tr.59). "Unskilled work" is defined in the regulations as work that "needs little or

no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). Therefore, a simple "task" and a simple "duty are one and the same" and provide regulations a "clear textual basis for the absence of a conflict here with respect to the Marker job" [ECF No. 25 at 13].

Defendant concludes that *Valdez* comports with Eleventh Circuit precedent, which has "found no apparent conflict between the capacity for 'simple, routine tasks' and reasoning level 2 jobs." [*Id.* at 13] (quoting *Hurtado v. Comm'r of Soc. Sec.*, 425 F. App'x 793, 795 (11th Cir. 2011). *See also Brendon M. v. Saul*, No. 1:19-cv-05089, Doc. 20 at 18-21 (N.D. Ga. Nov. 4, 2020) (remanding on other grounds but finding "the limitation to simple, routine, and repetitive work in the hypothetical posed to the VE did not create an apparent conflict with jobs in the DOT having a reasoning level of 2"); *Green v. Saul,* No. 8:19-cv-2021-T-TGW, 2020 WL 5743185, at *7-10 (M.D. Fla. Sept. 25, 2020) (no apparent conflict between a limitation to simple, routine, repetitive tasks and jobs requiring a reasoning level of 2); *Sullivan v. Saul*, No.3:20-cv-00010-JBT, Doc. 16 at 5-7 (M.D. Fla. Sept. 10, 2020) (relying on *Valdez* in finding no apparent conflict between a limitation to simple, routine tasks and the reasoning level 2 jobs identified by the VE, but remanding on other grounds).

I find Defendant has the better of the argument. First, Plaintiff is silent on any inconsistency related to the Housekeeping Cleaner position, which lists a reasoning level 1. [ECF No. 25 at 4]. Here, Plaintiff's argument falls within the *Valdez* court's core holding that even if there is an inconsistency, the ALJ "still concluded" that she can perform one other job, and the analysis could end there. *Valdez*, 808 F. App'x at 1009. Furthermore, Defendant correctly points to the proper definition for terms like "simple" to mean "easily understood or done" and "[u]sed to emphasize

28

the fundamental and straightforward nature of something [ECF No. 25 at 12] (quoting *Lexico*, "Simple," https://www.dictionary.com/browse/simple (last visited February 6, 2023)).

Defendant also correctly states that the term simple, which can also mean "having or made of only one or a few parts" comports with the definition of reasoning level 2, to mean "few … variable." [*Id.* at 12] (quoting *Cambridge Dictionary*, "Simple," https://dictionary.cambridge.org/us/dictionary/english/simple (last visited February 6, 2023)).

On the same note, "routine" means "of a commonplace or repetitious character," or "relating to, or being in accordance with established procedure." quoting Merriam-Webster, "Routine," https://www.merriam-webster.com/dictionary/routine (last visited February 6, 2023).

In conclusion, I find Plaintiff has brought insufficient evidence and caselaw to warrant reversal of the ALJ decision because vocational expert Gary Fannin's testimony constituted substantial evidence on which the ALJ could rely.

### III.     The ALJ Properly Assessed the Opinion Evidence of Record

Plaintiff next argues that the ALJ erred in affording less than controlling weight to her primary treating physicians Dr. McRoberts and Dr. Hale and examining physician Dr. Adam. [ECF No. 23 at 41]. Plaintiff asserts that since her claim was filed prior to March 27, 2017, the treating physician's rule, articulated in 20 C.F.R. § 404.1527(c) was controlling, and therefore the ALJ was required to give her treating physicians' opinions controlling weight absent a showing of good cause for not doing so. [*Id.*]. As Plaintiff sees it, the ALJ failed to show good cause "for according less than controlling weight to her treating physicians' opinions." [*Id.*].

Defendant, on the other hand, counters by arguing that Dr. McRoberts never actually provided a "medical opinion concerning a disabling limitation" such that the ALJ was not required to state the weight he afforded to Dr. McRoberts' notes. [ECF No. 25 at 16, 20–21]. Additionally,

Defendant contends that the ALJ provided sufficient good cause to afford less than controlling weight to the opinions of Dr. Hale and Dr. Adam, because he demonstrated those opinions were inconsistent with the record evidence as a whole. [*Id.* at 16].

"Medical opinions are statements from physicians and other acceptable medical sources that reflect judgment about the nature and severity of the claimant's impairment." *Tavarez v. Comm'r of Soc. Sec.*, 638 F. App'x 841, 846 (11th Cir. 2016) (internal citation omitted). "In evaluating medical opinions, the ALJ must clearly articulate the weight given to different medical opinions and the reasons for [] assigning that weight." *Id.* For claims filed before March 27, 2017, a "treating physician's opinion generally is entitled to 'substantial or considerable weight.'" *Perez Guerrero v. Colvin*, No. 14-23841-CIV, 2016 WL 4807953, at *4 (S.D. Fla. Mar. 23, 2016) (quoting *Whitton v. Comm'r, Soc. Sec. Admin.*, 643 F. App'x 842, 845 (11th Cir. 2016)); *see also* 20 C.F.R. § 404.1527(c)(2)[2] (explaining that a treating physician's opinion will be given controlling weight if it is supported by medically acceptable and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record). An ALJ may discount a treating physician's medical opinions where "good cause" exists to do so. *Id.* Good cause exists where the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1179 (11th Cir. 2011).

---

[2] Of note, a new "regulation 20 C.F.R. § 404.1520c (2017), abrogated the 'treating-physician rule' [for any claims filed after March 27, 2017] … [which] instructed administrative law judges to defer to the medical opinions of treating physicians in the determination of whether an individual is disabled under the Social Security Act. The new regulation instructs administrative law judges to give a treating physician's opinion no deference and instead to weigh medical opinions based on their persuasiveness." *Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 894 (11th Cir. 2022). Since Plaintiff's claims was filed prior to March 27, 2017, the new regulation is inapplicable to the instant case. *See Glover v. Comm'r, Soc. Sec. Admin.*, No. 22-10497, 2022 WL 17826364, at *3 (11th Cir. Dec. 21, 2022) (explaining that "[c]laims filed before March 27, 2017, (the date in which the new regulation too effect) are still subject to the old regulation and thus the treating physician rule").

As to Dr. McRoberts, although the ALJ failed to mention Dr. McRoberts by name, he did address Dr. McRoberts' treatment notes numerous times in the opinion. [ECF No. 17 at 25–30]. The ALJ, however, failed to assign any weight to Dr. McRoberts' opinion or medical notes. *See generally* [*Id.*]. Defendant seems to argue that Dr. McRoberts' treatment notes do not constitute an opinion because he treated Plaintiff for less than a year from her alleged onset date, and therefore his opinions were not required to be assigned any weight. This argument fails to pass muster. The Eleventh Circuit has explained that "[m]edical opinions are statements from physicians and other acceptable medical sources that reflect judgment about the nature and severity of the claimant's impairment." *Tavarez*, 638 F. App'x at 846. Defendant fails to cite, and this Court is unaware, of any cases in which an ALJ may forego assigning *any* weight to a claimant's treating physician because the claimant treated with that physician for less than a year from their alleged onset date. In his treatment notes, Dr. McRoberts routinely reflect his judgment concerning the severity of Plaintiff's impairments. As such, these treatment notes constituted an opinion to which the ALJ was required to assign weight. Therefore, the ALJ's error in failing to assign weight to Dr. McRoberts' opinion is error. *See Lara v. Comm'r of Soc. Sec.*, 705 F. App'x 804, 811 (11th Cir. 2017) (noting that "[a]n ALJ must evaluate every medical opinion received and assign weight to each opinion").

Although the ALJ's failure to explicitly assign weight to Dr. McRoberts' opinion was error, the error was harmless. In *Lara*, the Eleventh Circuit addressed a similar situation, as the ALJ failed to assign weight to a number of the plaintiff's treating physicians' opinions. *Id.* at 811–12. The court ultimately found this error was harmless, however, because "[t]he ALJ's decision reflects that she considered the treatment notes of these medical sources, and her decision was

consistent with the records." *Id.* at 812. As such, the court found "that any error in failing to assign weight was harmless." *Id.*

    That is the same situation this Court is confronted with. Here, the ALJ clearly considered Dr. McRoberts' opinion since he cited to the doctor's opinions numerous times. The ALJ noted that during a July 7, 2016, examination Dr. McRoberts had "indicated that the claimant was well groomed and displayed no evidence to suggest depression, anxiety, or agitation." [ECF No. 17 at 22]. The ALJ further noted that during the same July 7, 2016, examination, Dr. McRoberts' notes "contained assessments of global weakness from disuse; musculoskeletal neck pain, musculoskeletal trapezii pain, and low back pain with mild multilevel cervical degenerative disc disease and lumbar degenerative disc disease and mild lumbar spondylosis and cervical spondylosis." [*Id.* at 25]. This demonstrates that the ALJ considered Dr. McRoberts' opinion, and found Dr. McRoberts' opinion was consistent with the record and used his opinions in conjunction with the rest of the record to arrive at his conclusion regarding Plaintiff's RFC. Consequently, any error on the ALJ's part in failing to specifically assign weight to Dr. McRoberts' opinion was harmless.

    The ALJ's choice to afford less than controlling weight to Dr. Hale's and Dr. Adam's opinions was supported by good cause. Regarding Dr. Hale, the ALJ found that "[t]he degree of limitations opined by Dr. Hale is not consistent with the record." [ECF No. 17 at 28]. In support of this assertion, the ALJ pointed to a number of different examinations between February 2016 through July 2017, which indicated that Plaintiff was in no acute distress, had normal strength, normal muscle tone, normal gait, and could walk heel to toe. [*Id.* at 28–29]. Further, the ALJ relied on Plaintiff's own statement that she could prepare her own meals, clean, do laundry, drive, and shop in stores. [*Id.* at 26]. The ALJ further noted Plaintiff did not require a wheelchair to ambulate,

that her diagnostic imaging generally showed only mild degenerative changes and no chord compression. [*Id.* at 25–27]. Additionally, the ALJ relied on medical expert Dr. Krishnamurthi's testimony and state agency expert Thomas Renny, D.O. Dr. Krishnamurthi, who noted Plaintiff had severe impairments related to her degenerative disc disease of the cervical spine, degenerative joint disease of the lumbar spine, and asthma, and ultimately concluded that Plaintiff could "lift frequently 10 pounds, occasionally 20 pounds, and sit six out of eight-hour period; stand and walk together total six  hours out of eight-hour period." [ECF No. 17-1 at 15]. Similarly, state expert Thomas Renny, whose opinion the ALJ afforded considerable weight, found Plaintiff could perform light work, stand, sit, and walk six hours in an eight-hour workday. [ECF No. 17 at 26, 119]. Taken together, the opinions of Dr. Krishnamurthi and state expert Thomas Renny, Plaintiff's own conflicting testimony, and the numerous physical examinations provide sufficient good cause for the ALJ to have given Dr. Hale's opinion less than controlling weight.

The same holds true with the ALJ's decision to afford Dr. Adam's opinion little weight. Dr. Adam indicated that Plaintiff had impaired mobility such that she was required to use a wheelchair to ambulate. [ECF No. 17 at 29, 517]. The ALJ noted this conclusion was contradicted by the record evidence and Plaintiff's own statements. The other treating physicians did not conclude that Plaintiff required a wheelchair, but rather "only uses a wheelchair during major back flairs 2–3 times yearly (approximately)." [*Id.* at 29, 528]. Again, considered with the record evidence described above, the ALJ had good cause to afford Dr. Adam's opinion less than controlling weight.

## IV.     The ALJ's RFC Finding is Supported by Substantial Evidence

Plaintiff next argues that the ALJ's RFC finding is not supported by the record evidence because the ALJ "considerably overestimates, among other things, [Plaintiff's] capacity to sit,

stand, and walk on a sustained basis, because [the ALJ] assumes, in part, [Plaintiff] would be able to stand and/or walk for up to six hour out of an eight-hour workday, an inherent requirement for light exertional work." [ECF No. 23 at 55]. As Plaintiff sees it, the ALJ's conclusion regarding her ability to perform light exertional work "is simply inconsistent with the record, as a whole and inconsistent with the opinions of Drs. McRoberts, Hale, and Adam." [*Id.*].

The ALJ has a duty to assess Plaintiff's RFC based on all relevant evidence in the record. *Philips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). This Court may not reweigh evidence or substitute judgment for that of the Commissioner. *Id.* at 1240 n.8.

Here, as Defendant notes, the ALJ considered all relevant evidence in coming to his RFC determination, including: (1) diagnostic imaging; (2) medical expert testimony; (3) opinion evidence from state agency experts; (4) treating physician opinions and evidence; (5) opinion evidence from consultative medical examiners; and (6) Plaintiff's activities and testimony. Based on this evidence, the ALJ concluded Plaintiff can perform light exertional work. In arriving at this conclusion, the ALJ relied on the substantial evidence in the record. Plaintiff may disagree with this conclusion, but it does not mean that the ALJ's RFC finding was erroneous. Nor is this Court able to overturn the ALJ's decision because it may have reached a different conclusion if it were the finder of fact or were to reweigh the evidence anew.

## V.     The ALJ's Evaluation of Plaintiff's Subjective Complaints is Supported by Substantial Evidence

Lastly, Plaintiff alleges the ALJ erred in considering Plaintiff's subjective complaints regarding her level of pain. To establish a disability through subjective complaints of pain or other symptoms, a plaintiff is required to show (1) evidence of an underlying medical condition, and either (2) objective medical evidence confirming the severity of the alleged pain or (3) that the objectively determined medical condition is severe enough to be reasonably expected to cause the

claimed pain or symptoms. 20 C.F.R. § 416.929(c)–(d); *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). Here, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the cervical and lumbar spine, asthma, major depressive disorder, and generalized anxiety disorder. [ECF No. 17 at 20].

After confirming that a plaintiff has a medically determinable impairment, the ALJ must evaluate the plaintiff's subjective complaints of pain or symptoms, and is required to determine if the severity of the impairment meets the appropriate statutory standards. 20 C.F.R. § 416.929(c)–(d). If the ALJ discredits subjective testimony of pain or other symptoms, he or she must articulate explicit and adequate reasons for doing so. *Wilson*, 284 F.3d at 1225 (citing *Holt v. Sullivan*, 921 F.3d 1221, 1223 (11th Cir. 1991)). Like with other facets of a social security appeal, an articulated reason for discrediting a plaintiff's testimony based on substantial evidence will not be challenged by the reviewing court. *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986)). Further, an adequate credibility finding does not need to cite "particular phrases or formulations" in the determination, but must avoid "broad findings" that enable the court to conclude that the ALJ did not consider the "medical condition as a whole." *Jamison v. Bowen*, 814 F.3d 585, 588–90 (11th Cir. 1987); *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983) (remanding where the ALJ did not specifically address testimony by plaintiff and her daughter about plaintiff's pain).

To achieve this end, SSR 16-3p sets forth a number of factors for an ALJ to consider in evaluating a claimant's testimony or claims regarding her subjective pain levels, symptoms, and concomitant limitations, which include: (1) the individuals' daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any

medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for pain relief; (5) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors that may be relevant concerning the claimant's functional limitations or restrictions.

Here, Defendant contends that in her argument that the ALJ failed to adequately consider her subjective complaints, Plaintiff does little more than say her subjective complaints are consistent with the record, that the ALJ failed to consider this and therefore erred, and that she does so without pointing to any specific failures by the ALJ. [ECF No. 25 at 22–23]. Thus, Defendant reasons that "[t]his type of argument gives neither the Commissioner nor the Court any guidance aside from the facts that she asserts the existence of an error … [and since] Plaintiff does not develop an adequate argument on the issue of the ALJ's subjective complaints analysis, the Commissioner respectfully suggests that this Court need not address it." [*Id.* at 23]. Alternatively, Defendant argues that substantial evidence supports the ALJ's analysis of Plaintiff's subjective complaints. [*Id.*]. I agree.

After laying out the two-step process an ALJ must undertake in considering a claimant's subjective complaints, the ALJ noted that:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and the other evidence in the record for the reasons explained in this decision.

[ECF No. 17 at 24]. The inconsistencies the ALJ referred to in the decision have been described at some length in this report. They include the seven physical and mental examinations between February 2016 and July 2017 in which the physicians found Plaintiff was not in acute distress, had normal strength and muscle tone, a normal gait, negative straight leg raise, could

perform a heel and toe walk, was alert and attentive, and could follow complex commands, and had normal memory. [*Id.* at 25–26]. The ALJ also relied on Plaintiff's diagnostic imaging results which generally showed mild degenerative changes and no cord compression. [*Id.* at 24–25]. Moreover, the ALJ took note of Plaintiff's own statements in which she reported to her medical providers that she "prepares her own meals, is able to clean and do laundry, drives, shops in stores, is able to count change and use a checkbook, and spends time with others." [*Id.* at 26]. As such, the ALJ adequately addressed Plaintiff's subjective complaints and refuted it with specific evidence from the record. This constitutes substantial evidence, and it is not for this Court to reweigh or otherwise second guess the ALJ's conclusion in this regard.

## CONCLUSION

Because the ALJ's decision is supported by substantial evidence and is based on proper legal standards, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment [ECF No. 23] be **DENIED**, the Commissioner's Motion for Summary Judgment [ECF No. 25] be **GRANTED**, and the ALJ's decision be **AFFIRMED**.

Objections to this Report may be filed with the district judge within fourteen days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the district judge of anything in this Report and shall constitute a waiver of a party's "right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C).

**SIGNED** this 26th day of June, 2023.

LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc:    **United States District Judge Rodney Smith;**

       **All Counsel of Record**